**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GREGORY BUCKINGHAM, JACK CRUCE, MICHAEL GRAVES, JOHN MICHAUD, CHRISTIAN SOWERS AND GEOFFREY WALKER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ATKORE INC.; CANTEX INC.; DIAMOND PLASTICS CORPORATION; IPEX USA LLC; PIPELIFE JETSTREAM, INC.; J-M MANUFACTURING COMPANY, INC. D/B/A JM EAGLE; NATIONAL PIPE & PLASTICS, INC.; NORTHERN PIPE PRODUCTS, INC.; OTTER TAIL CORPORATION; PRIME CONDUIT, INC.; SANDERSON PIPE CORPORATION; SOUTHERN PIPE, INC.; WESTLAKE CORPORATION; WESTLAKE PIPE & FITTINGS CORPORATION; VINYLTECH CORPORATION and OIL PRICE INFORMATION SERVICE, LLC, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiffs Gregory Buckingham, Jack Cruce, Michael Graves, John Michaud, Christian Sowers, and Geoffrey Walker ("Plaintiffs") bring this antitrust action on behalf of themselves and all persons and entities who purchased, for end use, PVC Pipe manufactured by a Defendant and sold through a reseller or distributor in the United States between January 1, 2021 and the present (the "Class Period"). Plaintiffs bring this action on behalf of a

1

nationwide class of end users against Defendants for injunctive relief under the antitrust laws of the United States, and on behalf of a single multistate class of end users for damages under the various state antitrust, consumer protection, and unjust enrichment laws (defined below and hereinafter the "Classes"), and demand a trial by jury.

## I.  NATURE OF THE ACTION

1.     The manufacturers of PVC Pipe are called converters. The Converter Defendants in this case are the leading manufacturers of PVC Pipe in the United States: Atkore Inc.; Cantex Inc.; Diamond Plastics Corporation; IPEX USA LLC; PipeLife Jetstream, Inc.; J-M Manufacturing Company, Inc. d/b/a JM Eagle; National Pipe & Plastics, Inc.; Northern Pipe Products, Inc.; Otter Tail Corporation; Prime Conduit, Inc.; Sanderson Pipe Corporation; Southern Pipe, Inc.; Westlake Corporation; Westlake Pipe & Fittings Corporation; and Vinyltech Corporation. The Converter Defendants control approximately 90% of the PVC Pipe municipal water application category and approximately 95% of the PVC electrical conduit application category in the United States.

2.     During the Class Period, Defendants and their Co-Conspirators conspired and combined to fix, raise, maintain, and stabilize the price of PVC Pipe in the United States. Defendants did so by communicating through an information-exchange firm called Oil Price Information Service, LLC ("OPIS"), which enabled the Defendants to discuss and signal their pricing activities, gain access to standardized pricing data from their competitors, and collectively extract artificially inflated profits from their customers. OPIS went far beyond just facilitating the private and non-public sharing of information: OPIS repeatedly served as a conduit between the Converter Defendants, allowing them to communicate their intentions on pricing in furtherance of their antitrust conspiracy.

3.     The United States Department of Justice's Antitrust Division ("DOJ") has launched an investigation into the alleged price-fixing in the PVC Pipe industry in August 2024. In a SEC filing, Otter Tail Corporation, a PVC Pipe manufacturer and named defendant, disclosed that it had received a grand jury subpoena from the DOJ on August 27, 2024.

4.     Defendants' anticompetitive actions widened the spread between the price that the Converter Defendants pay to manufacture PVC Pipe and the price at which they sold PVC Pipe, injuring Plaintiffs and the Classes.

5.     While the purchases made by Plaintiffs and members of the proposed Classes were for end use, their claims may be considered indirect claims or direct claims depending on the Court's eventual finding, after discovery, regarding the distributors' involvement in the conspiracy. Therefore, Plaintiffs reserve their rights to seek damages under Section 1 of the Sherman Act on behalf of a nationwide class of end users who purchased from co-conspirator non-converter resellers and thus have direct-purchaser claims against Defendants.

## II.     JURISDICTION AND VENUE

6.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one Defendant.

7.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman

Antitrust Act (15 U.S.C. § 1). Plaintiffs also bring state-law class claims on behalf of the multi-state damages class to recover actual and/or compensatory damages, double and treble damages as permitted, the costs of this suit, and attorneys' fees for injuries caused by Defendants' anticompetitive conduct, which resulted in prices for PVC Pipe being artificially inflated at supra-competitive levels throughout the Class Period. Therefore, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Section 16 of the Clayton Act. The Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

8.     Venue is proper in this District pursuant to Sections 12 and 16 of the Clayton Act (15 U.S.C. §§ 22 and 26), and pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because Defendants, through their owned or controlled subsidiaries and affiliates, transacted business in this District; sold the products or services at issue in this District; had substantial contacts with this District; and engaged in anticompetitive conduct that was directed at and had a foreseeable, direct, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District.

9.     This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of PVC Pipe throughout the United States, including this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

10.     The activities of the Defendants and their Co-Conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

### III.     PARTIES

**A.     Plaintiffs.**

11.     Plaintiff Gregory Buckingham is a citizen of Massachusetts. During the Class Period, he purchased in Massachusetts PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including Cantex Inc. and JM Eagle, for end use and was overcharged as a result of the Defendants' actions described herein.

12.     Plaintiff Jack Cruce is a citizen of Florida. During the Class Period, he purchased in Florida PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including Cantex and Prime Conduit, for end use and was overcharged as a result of the Defendants' actions described herein.

13.     Plaintiff Michael Graves is a citizen of Arizona. During the Class Period, he purchased in Arizona PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including JM Eagle, for end use and was overcharged as a result of the Defendants' actions described herein.

14.     Plaintiff John Michaud is a citizen of Florida. During the Class Period, he purchased in Connecticut PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including Atkore Inc., for end use and was overcharged as a result of the Defendants' actions described herein.

15.     Plaintiff Christian Sowers is a citizen of Wisconsin. During the Class Period, he purchased in Wisconsin PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including Cantex Inc., for end use and was overcharged as a result of the

Defendants' actions described herein.

16.     Plaintiff Geoffrey Walker is a citizen of South Carolina. During the Class Period, he purchased in South Carolina PVC Pipe manufactured by one or more Defendants or their Co-Conspirators, including IPEX USA LLC, for end use and was overcharged as a result of the Defendants' actions described herein.

**B.     Defendants.**

17.     Defendant Atkore Inc. ("Atkore") is a publicly traded Delaware corporation headquartered in Harvey, IL. During the Class Period, Atkore and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18.     Defendant Cantex Inc. ("Cantex") is a Delaware corporation headquartered in Fort Worth, TX. Cantex is jointly owned by Mitsubishi Corporation ("Mitsubishi") and Shin-Etsu Chemical Co. Ltd. ("Shin-Etsu"). During the Class Period, Cantex and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     Defendant Diamond Plastics Corporation ("Diamond Plastics") is a Delaware corporation headquartered in Grand Island, NE. During the Class Period, Diamond Plastics and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.     Defendant IPEX USA LLC ("IPEX") is a Delaware company headquartered in Pineville, NC. It is a wholly owned subsidiary of Aliaxis SA, a Belgian corporation.

During the Class Period, IPEX and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.     Defendant J-M Manufacturing, Inc. d/b/a JM Eagle ("JM Eagle") is a California corporation headquartered in Los Angeles, CA. During the Class Period, JM Eagle and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.     Defendant National Pipe & Plastics, Inc. ("National Pipe") is a Delaware corporation headquartered in Endicott, NY. It is a wholly owned subsidiary of CRH PLC, an Irish public limited company. During the Class Period, National Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23.     Defendant Northern Pipe Products, Inc. ("Northern Pipe") is a North Dakota corporation. It is a wholly owned subsidiary of Otter Tail Corporation ("Otter Tail") and located in Fargo, ND. Along with Defendant Vinyltech Corporation, it comprises Otter Tail's plastics segment. During the Class Period, Northern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24.     Defendant Oil Price Information Service LLC ("OPIS") is a Maryland corporation headquartered in Rockville, MD. It is a wholly owned subsidiary of News Corp.

7

Throughout the Class Period, OPIS conspired with the Converter Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their Co-Conspirators.

25. Defendant Otter Tail Corporation is a publicly traded Minnesota corporation headquartered in Fergus Falls, MN. During the Class Period, Otter Tail and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

26. Defendant PipeLife Jetstream, Inc. ("PipeLife") is a privately held Delaware corporation headquartered in Siloam Springs, AR. PipeLife is the United States division of Austria-based PipeLife Group, one of the world's largest manufacturers of plastic pipe and systems. During the Class Period, PipeLife and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

27. Defendant Prime Conduit, Inc. ("Prime Conduit") is a Delaware corporation headquartered in Cleveland, OH. Prime Conduit is jointly owned by Shin-Etsu and Mitsubishi. During the Class Period, Prime Conduit and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

28. Defendant Sanderson Pipe Corporation ("Sanderson") is a privately held Delaware corporation headquartered in Clarksville, TN. Sanderson is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Sanderson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce,

directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

29.     Defendant Southern Pipe, Inc. ("Southern Pipe") is a Delaware corporation headquartered in New London, NC. Southern Pipe is jointly owned by Mitsubishi and Shin-Etsu. During the Class Period, Southern Pipe and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30.     Defendant Vinyltech Corporation ("Vinyltech") is an Arizona corporation. It is a wholly owned subsidiary of Otter Tail and located in Phoenix, AZ. Along with Northern Pipe, it comprises Otter Tail's plastics segment. During the Class Period, Vinyltech sold PVC Pipe in interstate commerce directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

31.     Defendant Westlake Corporation ("Westlake") is a publicly traded Delaware corporation headquartered in Houston, TX. During the Class Period, Westlake and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

32.     Defendant Westlake Pipe & Fittings Corporation is a Delaware corporation headquartered in Houston, TX. It is a wholly owned subsidiary of Westlake Corporation. Westlake Pipe & Fittings Corporation was known as "NAPCO Pipe & Fittings" prior to May 2022. Prior to 2019, Westlake Pipe & Fittings was known as "North American Pipe Corporation" ("NAPCO")." During the Class Period, Westlake Pipe & Fittings and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Defendant Westlake Pipe & Fittings Corporation, and its predecessor NAPCO Pipe & Fittings, are collectively called "Defendant Westlake Pipe & Fittings."

33.    Defendants Otter Tail Corporation, Northern Pipe Products, Inc., and Vinyltech Corporation are referred to collectively as "the Otter Tail Defendants." Defendants Westlake Corporation and Westlake Pipe & Fittings, and their predecessors are referred to collectively as "the Westlake Defendants." Defendants Cantex, Diamond Plastics, Sanderson, and Southern Pipe are referred to collectively as "the Mitsubishi/Shin-Etsu Defendants."

## IV.    AGENTS AND CO-CONSPIRATORS

34.    Core & Main, Inc. ("Core & Main") is a publicly traded corporation headquartered in St. Louis, MO. It is a wholesale distributor of municipal pipes. During the Class Period, Core & Main and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Core & Main is the largest distributor of PVC municipal water pipes in the United States.

35.    Ferguson Enterprises, Inc. ("Ferguson") is a publicly traded Virginia corporation headquartered in Newport News, VA. During the Class Period, Ferguson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Ferguson is one of the largest distributors of PVC municipal water pipes in the United States.

36.     Fortiline Waterworks ("Fortiline") is a North Carolina corporation headquartered in Concord, NC. It is a wholly owned subsidiary of MORSCO, Inc. During the Class Period, Fortiline and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold PVC Pipe in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Fortiline is one of the largest distributors of PVC municipal water pipes in the United States.

37.     Various other persons, firms and corporations not named as Defendants have participated as Co-Conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not the Co-Conspirators are named as Defendants in this Complaint.

## V.  FACTS

### A.     Background on PVC Pipe.

38.     PVC is an acronym for polyvinyl chloride, which is a polymer of plastic. Considered commodity products, PVC Pipe is comprised of tubular sections or hollow cylinders made from PVC. In the United States, the manufacturing of PVC Pipe is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing PVC Pipe are well-established. The demand for PVC Pipe is relatively stable due to the prevalence of construction projects and infrastructure maintenance in the United States.

39.     There are three main types of PVC Pipe: (1) PVC municipal pipe, which includes PVC municipal drinking water pipe and PVC municipal sewer pipe, (2) PVC plumbing or Drain, Waste, Vent pipe, and (3) electrical conduit pipe.

40.     The largest category of application for PVC Pipe is municipal water pipe,

which is a commodity product. Municipal water pipes carry the municipal, potable (i.e., drinking) water supply from reservoirs, lakes, or rivers to treatment facilities and from there to water mains that distribute water throughout the community. PVC Pipe is also used in wastewater collection systems. PVC Pipe is engineered and tested to withstand high internal and external pressures and to provide an assurance of safety and longevity once installed.

41.     PVC plumbing pipe, or Drain, Waste, Vent ("DWV") pipe, is typically used for potable water systems, irrigation, and drainage.

42.     PVC electrical conduit pipe is used to insulate and protect wires, typically electrical wires. PVC electrical conduit pipe is resistant to burning, corrosion, moisture, and sunlight, making it appropriate for outdoor applications. It is also typically lighter than its common alternatives. For example, PVC electrical conduit pipe is one-fifth the weight of steel and half the weight of aluminum. Further, as the Federal Trade Commission ("FTC") previously found, "the cost disparity between PVC and steel in electrical conduit is so great that PVC electrical conduit will remain substantially more cost-effective than steel, even after a substantial PVC resin price increase."

43.     The relative size of end uses in the PVC market is described by a presentation by Westlake to its investors, noting that municipal water PVC pipe (blue, green, and purple pipe) is 64% of the market, plumbing and irrigation PVC pipe (white pipe) is 31%, and PVC electrical conduit pipe is 5%.

44.     In terms of revenue, the PVC Pipe market in the United States was worth approximately $12.2 billion in 2023. Of that total, municipal water pipe constituted about 64% ($7.8 billion), PVC plumbing and irrigation pipe constituted about 31% ($3.7 billion), and PVC electrical conduit pipe constituted about 5% ($611 million).

**B.      OPIS provided Defendants with the means to unlawfully fix the prices of PVC Pipe.**

45.      Defendant OPIS is a commodity pricing service enabling users to buy, sell, and hedge fuel prices, including gasoline, diesel, propane, jet fuel, coal, and petrochemicals. It claims to "uniquely price[] commodities throughout the supply chain—from the spot market to the wholesale rack or terminal market and ultimately to more than 400,000 retail locations across North America and Europe." It is mainly known for its activities in the United States.

46.      OPIS is no stranger to antitrust litigation. According to the California Attorney General, price reporting by OPIS has been used to manipulate gasoline prices in California. In 2020, the California Attorney General brought a lawsuit against two energy companies, Vitol and SK Energy, alleging, in part, that they reported manipulated gasoline trades to OPIS—the most widely used gasoline reporting service in California—for the purpose of driving up the benchmark prices of regular and premium gasoline in OPIS's spot market report. On July 11, 2024, California secured a $50 million settlement with Vitol and SK Energy, resolving the allegations.

47.      OPIS publishes daily prices and market trends from across the entire petrochemical chain in the United States via PetroChem Wire. OPIS describes PetroChem Wire's reporting methodology as rigorous and consistent. PetroChem Wire performs "due diligence on every number and explains every price movement." It also has "established unique two-way relationships with players at the heat of the action." It gets "a daily inflow of prices and transactions from active traders every day, who in turn, benchmark off our numbers. Many major players don't report to anyone but [OPIS]."

48.      OPIS, via PetroChem Wire, provides a product called PVC & Pipe Weekly, which offers subscribers "access to timely information on pricing and supply/demand in the PVC pipe market." OPIS describes PVC & Pipe Weekly as a "thorough summary of the

U.S. domestic and export PVC market and the only pricing source for finished PVC pipe (municipal, plumbing, and conduit)." "Based on a methodology developed with market-makers on both the buy and sell side, the valuations published in [PVC & Pipe Weekly] reflect each week's current market realities." Upon information and belief, Plaintiffs understand that most, if not all, of the Converter Defendants subscribe and contribute to the PVC & Pipe Weekly publication. OPIS does not list its subscription fees publicly. Potential subscribers must contact OPIS for pricing information.

49.     OPIS lists the categories of customers it seeks to serve with its PVC & Pipe Weekly reports. They are NGL & petrochemical companies, PVC producers, PVC resin buyers, PVC pipe converters and distributors, traders, construction companies, and financial institutions. On information and belief, the Converter Defendants subscribed to PVC & Pipe Weekly. Few, if any, end users of PVC Pipe have access to PVC & Pipe Weekly.

50.     As its name suggests, PVC & Pipe Weekly publishes weekly PVC Pipe pricing data and converter commentary, which includes current pricing and often includes specific forward-looking pricing signaling and apparent invitations to coordinate on supracompetitive pricing. Examples of this signaling and these invitations are set out in this Complaint, *infra*.

51.     OPIS's PVC & Pipe Weekly publication proves the truth of the United States Supreme Court's caution that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."

52.     OPIS prepared weekly reports that permitted the Converter Defendants to exchange current sales information and coordinate future pricing activities. These reports, unavailable to anyone besides OPIS's paid subscribers, allowed the Converter Defendants

to fix, raise, maintain, and stabilize the price of PVC Pipe in violation of U.S. antitrust laws and the antitrust and consumer protection statutes of various states, as well as common law unjust enrichment of those states.

53.     The information exchanged by the Converter Defendants through Defendant OPIS is exactly the type of information exchange that the U.S. Supreme Court has recognized as likely to have anticompetitive effects under a rule of reason analysis.

54.     First, the data exchanged is current and forward looking (*e.g.*, telling competitors current future pricing strategies), which courts consistently describe as the greatest potential for generating anticompetitive effects.

55.     Second, the information maintained in OPIS's reports is specific to converters, including information on prices.

56.     Third, none of OPIS's pricing information is publicly available. OPIS is a subscription service, which has required the Converter Defendants to pay fees over the Class Period to access the data only OPIS has control over. OPIS ensured that its detailed and competitively sensitive information was available only to its subscribers. Thus, purchasers of PVC Pipe could not use OPIS's reports to negotiate lower prices. Instead, the Converter Defendants used them to fix, raise, maintain, and stabilize PVC Pipe prices.

57.     Defendant OPIS markets its PetroChem Wire service by claiming that "[w]ith a more exact picture of transactional prices in the supply chain, you can make more profitable decisions, whether you are converting olefins or manufacturing consumer products. Build inventory before prices go up, or delay if prices are falling." OPIS was true to its word. Its PVC & Pipe Weekly reports specifically enable the Converter Defendants to coordinate their future pricing activities with the purpose of elevating prices and the effect

of generating historic profit margins.

58.     Additionally, the PVC & Pipe Weekly report always includes pricing information and market intelligence for PVC resin. PVC resin is the primary raw material used in the production of PVC Pipe. PVC & Pipe Weekly essentially gives the Converter Defendants a one-stop, non-public shop for obtaining information concerning—and manipulating—PVC Pipe pricing in the United States.

**C.     Defendants were motivated to implement their price-fixing conspiracy.**

59.     Converters raised their prices for PVC municipal water pipes by approximately 500% between late 2019 and the middle of 2022. Similarly, converters raised their prices for PVC electrical conduit approximately 500%, from $0.63/lb. in late 2019 to $3.77/lb. in late 2021. These PVC Pipe price changes generated historic profits for the Converter Defendants, which motivated Defendants to implement and maintain their conspiracy.

60.     By the middle of 2022, the COVID-era supply chain issues plaguing the industry had normalized. By January 2023, the price of PVC resin had fallen to $0.51/lb., which is comparable to pre-COVID pricing levels. PVC resin prices have remained relatively stable since then. Defendants and their Co-Conspirators saw this situation as an opportunity to artificially boost the increased prices they enjoyed during the COVID era.

61.     Defendants and their Co-Conspirators took advantage of the situation. Defendants' profit margins remain extremely elevated to this day when compared to historic pricing data. For example, profit margins for Defendant Otter Tail exploded to 61% in 2023 from its 14% long-term average (2013-2019) due in large part to profit from its PVC municipal water pipe business.

**D.** **The COVID-19 pandemic provided Defendants with the opportunity to implement their conspiracy directly and through price signaling and information exchanges via OPIS.**

62.     Prior to the COVID pandemic, the prices for PVC Pipe remained relatively constant. Following supply chain disruptions due in part to the pandemic, the price of PVC resin increased from $0.43/lb. in late 2019 to $0.89/lb. in early 2022, approximately a 100% price increase. Defendants took this opportunity to significantly increase prices to their customers.

63.     Below are examples of the competitively sensitive information Converter Defendants exchanged through OPIS in furtherance of their anticompetitive agreement.

a.  On January 22, 2021, OPIS reported that "while some market participants believed that the market needed to be reset with a new price letter closer to the current price level, other[s] said that there is no reason converters can't push prices higher without a new price letter. ***The only requirement would be discipline.***" OPIS is the proverbial smoke-filled backroom that enables Defendants to implement their conspiracy. This invitation to restrain competition by coordinating future pricing actions in January 2021 coincides with the start of the dramatic increase in PVC Pipe prices.

b.  On October 28, 2022, OPIS reported that "[t]he steep drop in pipe demand makes it ***all the more remarkable that prices have remained rock solid*** at Block 440. Pipe makers give credit to distributors as they have been partners in the determination [to] not let prices slip." The fact that the PVC Pipe market was not responding to normal supply and demand market dynamics in October 2022 indicates that Defendants had accepted the invitation to coordinate pricing actions.

c.  On January 20, 2023, OPIS reported that Otter Tail's wholly owned subsidiary

"Northern Pipe and IPEX indicated that ***they would follow whatever the market does***." There is no pro-competitive reason for Northern Pipe or IPEX to signal to their competitors they would follow the market. This behavior is consistent with the "discipline" needed to push prices higher, and Defendants' need to monitor fellow conspirators.

d.  On January 27, 2023, OPIS reported that converters said, "they know demand will not kick in for weeks but were ***confident that they could hold prices firm as long as distributors were on the same page***." This invitation in January 2023 to distributors to coordinate future PVC Pipe pricing shows that Defendants sought to further insulate themselves from the normal supply and demand dynamics of a competitive market.

e.  On February 3, 2023, OPIS reported that "***[c]onverters had rallied around a price increase*** for Feb 1 which would push municipal pipe prices up to Block 445 for immediate sales and Block 450 for quotes." This coordinated price increase occurred at a time when PVC Prices had been stable for approximately 40 weeks in a row, while PVC resin prices had fallen.

f.  On February 10, 2023, OPIS reported that "while ***the increase announcements had been unanimous***, not all converters were particularly enthusiastic about the idea of trying to push for higher prices in early Feb. They said demand was still too low to support raising prices." This unanimous and disciplined increase in PVC Pipe pricing in the face of weak demand is an example of coordinated pricing action unsupported by market conditions. There is no pro-competitive justification for such an action.

g.  On February 23, 2023, OPIS reported that "***Converters spoke about working in concert with large distributors for months to keep pricing from sliding*** below Block 440 to prevent devaluing distributor inventories." Converters also "expressed some concern about whether distributors would ***return the favor and help keep prices from dropping*** . . ." Prices for PVC municipal pipes remained elevated through July 2024, showing that distributors did, in fact, "return the favor."

h.  On May 26, 2023, OPIS reported that "[s]ome market participants viewed the news sheets more as an effort to stem the price erosion that has gripped the market rather than a true effort to push prices higher. With resin prices predicted to drop in May and June and demand still moribund, they said there doesn't seem to be either a demand pull or a cost push to move prices higher. On the other hand, some converters believed that as the originator of the new sheets ***Atkore needs to take a hard stand next week on new business at the higher price levels***." There is no pro-competitive reason to call on market leader Atkore to hold the line on higher price levels, while acknowledging that there is no economic reason for a price increase.

i.  On March 15, 2024, OPIS reported that "***[c]ompetitors said everyone needs to start moving prices up on business written from now on***, or distributors will continue to buy hand to mouth." Shortly thereafter, on April 24, 2024, OPIS reported that PVC electrical conduit prices had moved up to $3.90/ft from the March 15 price of $3.78/ft.

j.  On April 5, 2024, OPIS reported that "[t]he hope is that prices will continue to move up next week. Some competitors were still upset because a market leader

took hold for release orders at low prices [to] keep prices static through May for 10-truck orders and through Jun for 20-truck orders. ***The converter in question reported that none of the hold for release trucks were left in the Northeast, so that shouldn't be affecting prices anymore***." This discussion between competitors is another example of an invitation to restrain competition by coordinating future pricing actions. Further, there is no pro-competitive reason for Defendants to share company specific pricing.

k. On May 3, 2024, the OPIS Newsletter reported that "[c]onverters said the ***price hikes won't work unless everyone is working together to implement them***." The reason for this is that there is no economic justification for raising prices, so disciplined, anti-competitive collective action is required.

l. On May 10, 2024, the OPIS Newsletter reported that "[c]onverters hope to push prices higher next week but ***concede that it will have to be a unanimous effort to have any chance of success***."

m. On May 17, 2024, the OPIS Newsletter reported that larger converters were complaining about a small regional competitor holding its pricing at $360/100 ft in the East while the larger converters were trying to get prices up to a minimum of $370-375/100 ft. "The converter in question said it was not seeing higher prices from one of the market leaders, but competitors disputed that and said that market leader in question was quoting higher prices and the fact that the pricing range rose in the regions outside the East proved it." The conversation between competitors, facilitated directly by OPIS through its subscriber-only service, shows how OPIS created the proverbial smoke-filled backroom for Defendants.

20

n.  On May 24, 2024, OPIS reported that the unanimous price increase effort from early May 2024 succeeded in driving PVC electrical conduit prices up from $3.70 on May 3 to $3.80/ft on May 24.

o.  On June 21, 2024, the Converter Defendants used OPIS to coordinate the size and implementation date for a price increase on PVC municipal water pipes. Specifically, OPIS wrote that "converters acknowledge they will need to try again to raise prices. This time, some said, they 'need to put out prices letters with an increase of no more than 10 Blocks above the current market and *all aim for the same implementation date*. Then, if that increase is successful, to do it again.'" In the same report, the Converter Defendants used OPIS to signal a price increase on PVC electrical conduit pipe. OPIS wrote that PVC converters were seeking "*a single price increase that would take prices up by about 5% over the current market level*, with another percent added to account the discount." Yet again, OPIS was acting as a conduit for the Converter Defendants to coordinate on future pricing activities.

p.  Within a week, the Converter Defendants had accepted the invitation. On June 28, 2024, one week after reporting on the consensus of converters to seek a single price increase of 5% over the current market level, the OPIS Newsletter reported that *all major converters raised prices with almost identical pricing in every region they served*. Defendant Cantex issued price sheets at $396.75/100 ft in the East region, $396.75/100 ft in the South Central region, $431.25 in the North Central region, $402.50/100 ft in the Southwest region, and $425.50/100 ft in the Northwest region. Defendants Prime Conduit, National Pipe, Southern Pipe, and IPEX followed with

similar price sheets for the regions they serve. Defendant Atkore issued price sheets at $396.75/100 ft in the East and South Central regions, $431.25/100 ft in the North, and $402.50/100 ft in the Southwest.

64.     Defendants also coordinated their pricing activities through direct communication. For example, on November 4, 2022, OPIS wrote that "converters reported that recently there had been some cases of buyers fishing for a lower price by claiming that a competitor had sold to them at a lower number, ***but a phone call or two proved that this was not the case. So far, nobody has blinked***." Such instances demonstrate that Converter Defendants were using direct communication to contact one another and ensure they were each remaining disciplined on PVC pricing.

**E.     Defendants' conspiracy was successful.**

65.     In September 2023, Otter Tail made a presentation at the Sidoti Small-Cap Investor Conference regarding its PVC Pipe business, including Northern Pipe and Vinyltech's role in the PVC Pipe industry. On behalf of Northern Pipe and Vinyltech, OtterTail described the period from 2014 to 2017 as one of "chasing volume," in other words, competing for market share as one would expect in a competitive, commodity market. Otter Tail then characterized the period from 2017 to early 2020 as one where a few supply disruptions reset margins slightly higher between resin and PVC Pipe prices holds, and there was still normal competition between PVC manufacturers. Thereafter, Otter Tail explained that the PVC Pipe market was no longer chasing volume, but instead "competing" for margin, which is the price-fixing agreement described in this Complaint.

66.     The effect of the conspiracy can be seen by comparing the post-COVID prices for PVC municipal and electrical conduit pipes with the current prices.

67.     According to OPIS, prices for PVC municipal pipes continue to be

approximately 4.7x higher than pre-COVID levels.

68.     Similar increases in PVC Pipe pricing can be found in the following pricing charts from Federal Reserve Economic Data Charts related to plastic water pipes and non-current-carrying conduit.



*Figure 1 - FRED Plastic Water Pipe Pricing Analysis*



*Figure 2 - FRED Non-Current-Carrying Conduit and Conduit Fittings Pricing Analysis*

69.     According to OPIS, the COVID-era PVC resin supply chain issues plaguing the industry had normalized by late 2022. By January 2023, the price of PVC resin had fallen to $0.51/lb., which is comparable to pre-COVID pricing levels. PVC resin prices have

remained relatively stable since then.

70.     SEC filings from the Converter Defendants show that the elevated prices for PVC Pipe do not correlate to strong demand for the products. For example, Defendant Otter Tail reported that its prices for PVC Pipe manufactured to municipal standards increased by 198%, but volume for those pipes decreased by 23% from 2019 to 2023 cumulatively. This is not consistent with the laws of supply and demand – *i.e.*, when demand goes down, price should go down as well, absent coordination among commodity manufacturers.

71.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Classes paid artificially inflated prices for PVC Pipe during the Class Period. Plaintiffs and members of the Classes would have purchased PVC Pipe for lower prices resulting from a competitive market but for Defendants' conspiracy. As such, Plaintiffs and members of the Classes were directly injured by Defendants' unlawful conduct.

72.     PVC Pipe is the relevant product market, and the geographic market is the United States. The Converter Defendants possessed market power in the relevant product market during the Class Period.

**F.     "Plus factors" and market characteristics support the plausibility of the conspiracy.**

**1.     The PVC Pipe market is highly concentrated.**

73.     Market concentration is a plus factor in analyzing the plausibility of an antitrust conspiracy. The PVC Pipe industry is highly concentrated. Among the various PVC Pipe application categories, Converter Defendants have a substantial market share. The Converter Defendants control approximately 90% of the PVC Pipe municipal water application category and approximately 95% of the PVC electrical conduit application category in the United States. For the PVC Pipe market as a whole, Defendants possess a

substantial majority of the market share.

### 2. The PVC Pipe industry has high barriers to entry.

74.     The existence of high barriers to entry is one factor that makes the market susceptible to collusion. A collusive arrangement that raised product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the PVC Pipe market exist, precluding other entrants or would-be competitors from entering the market.

75.     During the Class Period and continuing today, substantial barriers impede entry into the PVC Pipe market. A new entrant into the market would face costly and lengthy start-up costs, including multi-hundred-million-dollar costs associated with building production facilities.

76.     The PVC Pipe market has been subject to increasing consolidation over the last several decades. Today, just three companies—Defendants Atkore, JM Eagle, and National Pipe—produce about half the municipal conduit PVC Pipe in the United States.

### 3. PVC Pipe is largely commoditized.

77.     When a product is characterized as a commodity, market participants primarily compete based on price. Where competition occurs principally based on price, it is easier to implement and monitor collusive agreements because price is more often objectively measurable than non-price factors.

78.     PVC Pipe is mass-produced through standardized manufacturing processes. They are designed to standardized technical and operational characteristics (*i.e.*, AWWA C900). There are no other defining characteristics that differentiate the Converter

Defendants' PVC Pipe from each other.

79.     The Converter Defendants are aware of the interchangeability of their specific products for PVC Pipe. Indeed, the Converter Defendants include the standardized technical and operation characteristics in their respective websites, product catalogues, and/or other materials distributed to PVC Pipe purchasers.

80.     The PVC Pipe at the center of the Defendants' conspiracy is commoditized.

### 4.  The demand for PVC Pipe is inelastic.

81.     Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss in sales.

82.     The FTC has found that pipes made from materials other than PVC are not close substitutes for PVC Pipe generally.

83.     Addressing municipal PVC water pipe specifically, the FTC found that demand is inelastic for at least two reasons. First, in many situations the choice of pipe material is based on factors other than price. These factors include the needs of a municipality for the distinctive properties of one kind of pipe over another to meet the use conditions of a particular area. Where the pipe product is selected based on factors other than price, changes in the price of municipal PVC water pipe will not affect the purchase decision. Second, in a case where price is an important consideration for pipe material selection, the total installed cost of a municipal PVC water pipe system is often substantially

less than that of a ductile iron or some other material. These two factors have led the FTC to consider the demand for municipal PVC water pipe to be inelastic.

### 5. Defendants had numerous opportunities to collude.

84.     An important factor for a court considering the plausibility of a price-fixing conspiracy is the existence of opportunities for competitors to meet directly with one another to facilitate a conspiracy. Through regular trade association meetings, Converter Defendants had numerous such opportunities.

85.     For instance, the Uni-Bell PVC Pipe Association ("PVCPA") is one of the most prominent PVC Pipe trade associations in the United States. It promotes the use of longer-life, lower-maintenance, corrosion-proof PVC Pipe in water and wastewater systems. It includes PVC electrical conduit converters as members. Defendants Atkore, Diamond Plastics, JM Eagle, National Pipe, IPEX, Otter Trail, and Westlake—representing approximately 90% of the PVC municipal water pipe market—are regular members of PVCPA. PVCPA hosts multiple events each year, including an annual meeting. Defendants Atkore, Diamond Plastics, JM Eagle, National Pipe, IPEX, Otter Trail, and Westlake have had representation on the PVCPA board of directors during the Class Period.

86.     High-level executives from Converter Defendants regularly attend the PVCPA's Annual Conferences. For example, in 2024, the following high-level executives attended the PVCPA Annual Meeting in Costa Rica: Jeff Sherman (Vice President and General Manager) and Michael "Mike" Deneen (Vice President of Sales for PVC and HDPE products) attended for Atkore; Skip Yentes (Vice President of Sales and Marketing) and John Britton (CEO) attended for Diamond Plastics; Travis Lutes (Management President) and Larry Gill (manager of codes and standards) attended for IPEX; Chuck Clark (Vice President of Operations) attended for JM Eagle; Matt Siegel (President) and Josh

Funderburk (Head of Strategic Sourcing) attended for National Pipe; Terry Mitzel (President of Plastic Segment) and John Abbott (Senior Vice President) attended for Otter Tail; and Andre Battistin (Vice President of Pipe and Fittings), Keith Moggach (National Manager for Specification Engineering), and Veso Sobot (then-Director of Corporate Affairs) attended for Westlake.

87.     During 2024, PVCPA has numerous Converter Defendant executives who sat on the Board of Directors, including Chuck Clark (JM Eagle), Andre Battistin (Westlake), John Britton (Diamond Plastics), Matt Siegel (National Pipe), Travis Lutes (IPEX), and Jeff Sherman (Atkore). Mr. Clark was Vice Chair; Mr. Battistin was Treasurer; and Mr. Siegel was Past Chair.

88.     In 2023, Messrs. Clark, Battistin, Siegel, Lutes, and Britton sat on the PVCPA Board of Directors. Mr. Clark was Vice Chair; Mr. Battistin was Treasurer; and Mr. Siegel was Past Chair.

89.     In 2022, Messrs. Siegel, Clark, Britton, Lutes, and Battistin sat on the PVCPA Board of Directors. Mr. Siegel was Chair; Mr. Clark was Treasurer; and Mr. Britton was Past Chair.

### 6. Abnormal pricing during the Class Period demonstrates the anticompetitive effects of Defendants' conspiracy.

90.     Beginning on or around January 1, 2021, the spread between PVC Pipe prices and PVC resin reported by OPIS began to move abnormally. PVC resin is the primary input cost for PVC Pipe production. For many years prior to January 1, 2021, the spread between PVC Pipe and PVC resin had remained at a consistent level. However, around this time, the spread widened significantly and remains extremely elevated, compared to historic levels, to the present day.

91.     OPIS pricing data shows that converters raised the price of PVC municipal water pipes approximately 500% between late 2019 and mid-2022. In July 2024, OPIS reported that prices for PVC municipal water pipes remained 4.7 times higher than they were pre-May 2020.

92.     By comparison, OPIS pricing data shows that PVC resin prices increased from $0.34/lb. in late 2019 to $0.89/lb. in early 2022, before falling back to a more normal level of $0.51/lb. in January 2023.

**G.     Defendants actively concealed the extent of their conspiracy, and Plaintiffs could not have discovered Defendants' anticompetitive conduct.**

93.     Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in secret price signaling and information exchanges that did not reveal facts that would have put Plaintiffs or the Classes on inquiry notice that there was an anticompetitive agreement to exchange information regarding PVC Pipe pricing and sales. Through the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Classes.

## VI.     RELEVANT MARKET

94.     This action alleges that the Defendants' coordinated horizontal conduct is a per se violation of the federal and state antitrust laws and consumer protection laws. In the alternative, Plaintiffs also allege that under Section 1 of the Sherman Act and the various state laws, the Defendants' agreement to unlawfully exchange competitively sensitive business information amongst PVC converters violates the rule of reason.

95.     Defendants compete in the PVC Pipe market for sales of PVC Pipe to customers; however, Defendants' agreement to exchange competitively sensitive business information through OPIS has enabled Defendants to reduce competition in the PVC Pipe market.

96.     This case concerns the sale of PVC Pipe for end-use in the United States.

97.     The relevant product market is the market for PVC Pipe, with different application categories.

98.     The relevant geographic market is the United States.

99.     As alleged above, high barriers to entry into the PVC Pipe market exist, precluding other entrants or would-be competitors from entering the market.

100.     As alleged above, the Converter Defendants and their Co-Conspirators exert significant market power in the PVC Pipe market.

101.     Competition is likely to be harmed when competitors with market power in a concentrated market, such as the market at issue here, exchange strategic business information about current and forward-looking plans for prices. The information exchanged between Defendants was competitively sensitive and a material factor in sales negotiations with customers. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to compete on price.

102.     The information exchange took place in non-public settings and involved the exchange of confidential, non-public information.

103.     The market for PVC Pipe is characterized by numerous attributes that mean the type of information exchange facilitated by OPIS is particularly likely to have anticompetitive effects. In particular, as alleged above, the market for PVC Pipe features

few sellers, commoditized products, price-based competition, and inelastic demand.

104. Defendants' unlawful information exchanges through OPIS were not reasonably necessary to further any procompetitive purpose.

## VII.    ANTITRUST INJURY

105. Defendants' anticompetitive conduct had the following effects, among others:

a.  Price competition has been restrained or eliminated with respect to PVC Pipe;

b.  The prices of PVC Pipe have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.  Plaintiffs and the Classes have been deprived of free and open competition; and

d.  Plaintiffs and the Classes paid artificially inflated prices for PVC Pipe.

**A.    Defendants' PVC Pipe Is Traceable Through the Chain of Distribution.**

106. The PVC Pipe that Plaintiffs and members of the Classes purchased were in substantially the same form as when they were initially sold by Defendants. In addition, PVC Pipe generally is labeled with product and/or manufacturer information that enables end-user Plaintiffs to determine whether the PVC Pipe they have purchased was produced by a Defendant. As a result, the PVC Pipe follows a traceable physical chain from Defendants to Plaintiffs and members of the Classes, and the overcharges on PVC Pipe can be traced from Defendants to Plaintiffs and members of the Classes.

**B.    Pass-Through of Defendants' Overcharge Is an Economic Necessity.**

107. When a firm's costs increase due to an overcharge or increasing raw materials costs, the firm will tend to pass on the cost increase by raising its price. Otherwise, it would lose money on each sale and be driven out of business. Conversely, when a firm's costs decrease, such as from improved production efficiency or decreasing energy costs, the firm will tend to pass on the cost decrease by lowering its price. Otherwise, competitors would

be able to undercut its prices, taking market share.

108.    Economic theory predicts that cost pass-through occurs in the distribution chain at issue here. When distribution chain participants face an industry-wide, non-transitory increase in the costs, they increase their prices. Thus, when PVC Pipe retailers, for example, pay higher prices for the products they purchase, they also increase their prices. This process is duplicated in the other routes PVC Pipe takes through distribution chain to Class members. The economic necessity of passing through cost changes increases with the degree of competition a firm faces. Economic theory shows that pass-through is likely to be close to 100% in markets that are highly competitive. In a highly competitive market, all businesses will set their prices slightly above their costs, resulting in narrow profit margins. If they did not, they would go out of business in the long run either by setting prices too low and losing money on every sale, or, setting prices too high and losing business to competitors.

109.    Here, because PVC Pipe are commoditized and relatively standardized products with limited differentiation, competition in the non-converter seller downstream markets focuses on price, availability, and customer service, rather than unique product features.  As such, resellers downstream from the Converter Defendants and any co-conspirators face intense price competition and pass-through is likely close to 100%.  For example, Home Depot, which recognizes that it competes with manufacturers, distributors, home improvement retailers, regional, and national hardware stores, and building material supply houses, acknowledges that its market is "highly competitive," and that the internet "facilitates competitive entry" and "price transparency." Other large retailers similarly acknowledge the "highly competitive" market within which they operate.

110.    Consequently, while direct purchasers were the first to pay supracompetitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiffs and members of the Classes when they purchased the PVC Pipe for end use.

**C.  The Amount of Defendants' Overcharge Passed Through the Chain of Distribution May be Measured and Quantified.**

111.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge paid by Plaintiffs and the members of the Classes. Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

112.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the business world, academia, and in litigation to determine the impact of a price increase on a product (or service). Thus, it is possible to isolate the effects of the alleged conspiracy on the price of PVC Pipe products. By controlling for major non-conspiracy factors that affect PVC Pipe product prices, a regression model can demonstrate whether the alleged conspiracy caused PVC Pipe prices to rise above competitive levels (the "overcharge"). Similarly, the pass-through rate of the overcharge can be estimated by regressing the price of the product on the cost of the product at each level of the distribution chain, while accounting for other factors that can impact price, such as product characteristics.

**D.  Plaintiffs and Members of the Classes Were Injured.**

113.    The purpose of the collusive conduct of Defendants and their Co-Conspirators

is to raise, fix, or maintain the price of PVC Pipe and, as a direct and foreseeable result, Plaintiffs and the members of the Classes paid supracompetitive prices for PVC Pipe during the Class Period.

114. By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for PVC Pipe than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

115. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII. CLASS ACTION ALLEGATIONS

116. Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(2), seeking injunctive and equitable relief on behalf of the following class (the "Nationwide Class"):

> All persons or entities that, during the Class Period, purchased for end-use PVC Pipe manufactured by Defendants and sold through resellers or distributors in the United States.

117. Plaintiffs also bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Statewide Damages Class"):

> All persons or entities that, during the Class Period, purchased for end-use PVC Pipe manufactured by Defendants and sold through resellers or distributors in Alabama, Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

118. The Nationwide Class and the Statewide Damages Class are referred to collectively as the "Classes" unless otherwise indicated. Specifically excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, and persons who purchased PVC Pipe directly from Defendants.

119. *Numerosity.* While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in the Classes. Joinder is therefore impracticable.

120. *Commonality.* Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a. Whether Defendants and their Co-Conspirators engaged in a conspiracy to artificially inflate the price of PVC Pipe;

b. The identity of the participants in the alleged conspiracy;

c. The duration of the alleged conspiracy and the acts carried out by Defendants and their Co-Conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust,

unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

e.  Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the Classes, thereby entitling Plaintiffs and Class members to disgorgement of all benefits derived by Defendants, as alleged in the following Claims for Relief;

f.  Whether the conduct of the Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and Class members;

g.  The effect of Defendants' alleged conspiracy on the price of PVC Pipe sold in the United States during the Class Period; and

h.  The appropriate class-wide measure of damages.

121.  **Predominance.** These and other questions of law or fact, which are common to the members of the Classes, predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

122.  **Typicality.** Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all Class members are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for PVC Pipe, resulting from price-fixing in the market for PVC Pipe by cartel members.

123.  **Adequacy.** Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs

have retained counsel with substantial experience litigating complex antitrust class actions in a myriad of industries and courts throughout the nation.

124.    ***Superiority.*** Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

125.    Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

126.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX.    CAUSES OF ACTION

### COUNT 1
### Restraint of Trade in Violation of the Sherman Act 15 U.S.C. § 1
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

127.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

128.    Beginning at least as early as January 1, 2021, the exact date being unknown to Plaintiffs, and continuing through the present, Defendants and their Co-Conspirators entered into a continuing agreement to unreasonably restrain trade and commerce in

violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of PVC Pipe manufactured to AWWA C900 industry standards sold directly to United States purchasers.

129. In particular, Defendants and their Co-Conspirators have combined and conspired to raise, fix, maintain or stabilize the prices of PVC Pipe sold to United States purchasers during the Class Period.

130. As a result of Defendants' and their Co-Conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for PVC Pipe sold to purchasers in the United States during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated levels.

131. The combination or conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their Co-Conspirators.

132. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their Co-Conspirators did those things they combined or conspired to do, including:

a. Participating in meetings and conversations to discuss their respective prices for PVC Pipe and how they effectively coordinate their actions to restrain trade for these products;

b. Communicating in writing and orally to raise, fix, maintain, and stabilize prices for PVC Pipe;

c. Agreeing to coordinate and manipulate prices of PVC Pipe directly sold to United States purchasers in a manner that deprived those purchasers of free and open price

competition;

d. Issuing or signaling to each other price announcements and price quotations for PVC Pipe in accordance with the agreements Defendants and their Co-Conspirators reached among themselves;

e. Selling PVC Pipe to United States purchasers at non-competitive and artificial prices that Defendants and their Co-Conspirators collusively determined; and

f. Providing pretextual justifications to purchasers and the public to explain any rises, maintenance, or stabilization of the prices for Defendants' PVC Pipe.

133. As a result of Defendants' and their Co-Conspirators' anticompetitive conduct, Plaintiffs and the Class have been injured in their business and property in that they have paid more for PVC Pipe they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

134. Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT 2**
**Violation for Section 1 of the Sherman Act, 15 U.S.C. § 1**
**for Conspiracy to Exchange Competitive Information**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

135. Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

136. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2021, and continuing through the present, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

137.    PVC Pipe is the relevant product market and the geographic market is the United States. The Converter Defendants possessed market power in the relevant product market during the Class Period.

138.    An increase in the price of PVC Pipe could be imposed collectively by other Defendants without causing many customers to switch their purchases to another product. PVC Pipe constitutes a unique product market.

139.    Defendants view PVC Pipe as fungible products. PVC Pipe is generally interchangeable, permitting the Converter Defendants to readily compare and match each other's pricing.

140.    The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about pricing plans regarding PVC Pipe. Defendants' information exchanges specifically included the exchange through OPIS of weekly reports regarding Defendants' PVC Pipe pricing that allowed Defendants to compare their prices with their competitors and raise prices that were lower.

141.    The Converter Defendants' regular information exchanges through OPIS reflected the concerted action between horizontal competitors in the PVC Pipe market.

142.    Each Converter Defendant integrator furnished competitively sensitive information to other Converter Defendants with the understanding that it would be reciprocated.

143.    The agreement to regularly exchange detailed and non-public information about current and future pricing suppressed competition between the Defendants. OPIS specifically permitted the Converter Defendants to coordinate their price increases.

144.    When Defendants competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through OPIS to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the PVC Pipe market. This strategic information was a material factor in the Converter Defendants' decisions to inflate the prices that Plaintiffs paid for PVC Pipe during the Class Period.

145.    Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

146.    The information exchange agreement has had the effect of (1) suppressing competition among Defendants in the market for PVC Pipe in the United States and (2) inflating the prices of PVC Pipe during the Class Period.

147.    As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and members of the Class have been injured in their business or property by paying artificially inflated prices for PVC Pipe during the Class Period.

## X. VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS

148.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

149.    During the Class Period, Defendants and their Co-Conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of PVC Pipe in various states to unreasonably restrain trade and commerce and harm

consumers in violation of the various state antitrust and consumer protection laws set forth below.

150. In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, raise, maintain, and stabilize the price of PVC Pipe which injured Plaintiffs and members of the Classes; exchanging competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

151. Defendants and their Co-Conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize PVC Pipe prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase PVC Pipe than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

152. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

153. Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular

jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

154.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

155.    In the Claims for Relief that follow, a reference to the "Class" is a reference to the Statewide Damages Class unless otherwise specified.

## COUNT 3: ALABAMA
### (On Behalf of Class Members That Purchased PVC Pipe in Alabama)

156.    Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Alabama; (2) prices of PVC Pipe in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. Defendants' anticompetitive actions have violated Alabama Antitrust Statute, Ala. Code §§ 8-10-1, *et seq.* Accordingly, Plaintiffs and the members of the Class seek all forms of relief available under Ala. Code § 8-10-1.

## COUNT 4: ARIZONA
### (On Behalf of Class Members That Purchased PVC Pipe in Arizona)

157.    Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Arizona; (2) prices of PVC Pipe in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe.

During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

158. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under that statute.

## COUNT 5: ARKANSAS
### (On Behalf of Class Members That Purchased PVC Pipe in Arkansas)

159. Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of PVC Pipe in the State of Arkansas were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce.

160. Defendants' agreement was an unlawful agreement to restrain trade and involved deceptive pricing practices in the State of Arkansas in violation of Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

## COUNTS 6 & 7: CALIFORNIA
### (On Behalf of Class Members That Purchased PVC Pipe in California)

161. Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout California; (2) PVC Pipe

prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

162. Defendants have entered into an unlawful agreement in restraint of trade in violation of California Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* During the Class Period, Defendants and their Co-Conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce in California. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, maintain, and stabilize prices of PVC Pipe. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their Co-Conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the price of PVC Pipe. For the purpose of forming and effectuating the unlawful trust, Defendants and their Co-Conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of PVC Pipe. As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for PVC Pipe than they otherwise would have paid in the absence of Defendants' unlawful conduct. Plaintiffs and members of the Class seek all forms of relief including treble damages pursuant to Cal. Bus. & Prof. Code § 16750(a).

163. Further, Defendants have engaged in unfair competition or unfair,

unconscionable, deceptive or fraudulent acts or practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*. The UCL claim is instituted pursuant to 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) violations of Section 1 of the Sherman Antitrust Act, set forth above; (2) violations of the Cartwright Act, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of the Cartwright Act, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent. Accordingly, Plaintiffs and members of the Class are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

### COUNT 8: CONNECTICUT
### (On Behalf of Class Members That Purchased PVC Pipe in Connecticut)

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Connecticut; (2) prices of PVC Pipe in the State of Connecticut were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4)

members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. § 35-24, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Conn. Gen. Stat. § 35-24, *et seq.*

## COUNTS 9 & 10: DISTRICT OF COLUMBIA
### (On Behalf of Class Members That Purchased PVC Pipe in the District of Columbia)

165.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the District of Columbia; (2) PVC Pipe prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Class were deprived of free and open competition; and (4) members of the Class, including those who resided in the District of Columbia and purchased PVC Pipe in the District of Columbia, paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

166.    Defendants have entered into agreements in restraint of trade in violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under D.C. Code § 28-4508.

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the District of Columbia Consumer Protection Act, D.C. Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 11 &12: HAWAII
### (On Behalf of Class Members That Purchased PVC Pipe in Hawaii)

168.    Defendants have entered into agreements in restraint of trade in violation of Hawaii Antitrust Act, Haw. Rev. Stat. § 480-4 and Hawaii Unfair or Deceptive Trade Practices Act, Haw. Rev. Stat. § 480-2. Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Hawaii; (2) prices of PVC Pipe in the State of Hawaii were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Haw. Rev. Stat. § 480-13.

## COUNTS 13 & 14: ILLINOIS
### (On Behalf of Class Members That Purchased PVC Pipe in Illinois)

169.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Illinois; (2) prices of PVC Pipe in the State of Illinois were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

170.    Defendants have entered into agreements in restraint of trade in violation of Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* Accordingly, Plaintiffs and members

of the Class seek all forms of relief including treble damages under 740 Ill. Comp. Stat. 10/7.

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 15: IOWA
### (On Behalf of Class Members That Purchased PVC Pipe in Iowa)

172.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Competition Law, Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Iowa; and (2) PVC Pipe prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code § 553.12.

### COUNT 16: KANSAS
### (On Behalf of Class Members That Purchased PVC Pipe in Kansas)

173.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout the State of Kansas; (2) PVC Pipe prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4)

members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Kan. Stat. Ann. § 50-161.

## COUNT 17: MAINE
### (On Behalf of Class Members That Purchased PVC Pipe in Maine)

174.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Antitrust Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Maine; (2) prices of PVC Pipe in the State of Maine were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief including treble damages under Me. Rev. Stat. Ann. tit. 10, § 1104.

## COUNT 18: MARYLAND
### (On Behalf of Class Members That Purchased PVC Pipe in Maryland)

175.    Defendants' combination or conspiracy affected economic activities within the State of Maryland. More specifically, (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Maryland; (2) prices of PVC Pipe in the State of Maryland were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe.

176.    Defendants violated Maryland Antitrust Act, Md. Code, Com. Law §§ 11-201, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief including treble damages under Md. Code, Com. Law § 11-209(4).

### COUNT 19: MASSACHUSETTS
### (On Behalf of Class Members That Purchased PVC Pipe in Massachusetts)

177.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Massachusetts; (2) prices of PVC Pipe in the State of Massachusetts were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

178.    Defendants violated Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A §§ 1, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of Massachusetts. Accordingly, Plaintiffs and members of the Class seek all relief available under including treble damages, under Mass. Gen. Laws Ch. 93A § 9.

### COUNTS 20 & 21: MICHIGAN
### (On Behalf of Class Members That Purchased PVC Pipe in Michigan)

179.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Michigan; (2) prices of PVC Pipe in the State of Michigan were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices

for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

180.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief including treble damages under Mich. Comp. Laws § 445.778.

181.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 22 & 23: MINNESOTA**
**(On Behalf of Class Members That Purchased PVC Pipe in Minnesota)**

182.    Defendants' combination and conspiracy had the following effect: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Minnesota; (2) prices of PVC Pipe in the State of Minnesota were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

183.    Defendants have violated Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Minn. Stat. § 325D.57.

184.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§

325F.68, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. § 8.31.

### COUNT 24: MISSISSIPPI
### (On Behalf of Class Members That Purchased PVC Pipe in Mississippi)

185.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Mississippi; (2) prices of PVC Pipe in the State of Mississippi were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code Ann. § 75-21-9.

### COUNTS 25 & 26: NEBRASKA
### (On Behalf of Class Members That Purchased PVC Pipe in Nebraska)

186.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Nebraska; (2) prices of PVC Pipe in the State of Nebraska were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

187.    Defendants restrained trade and commerce in the State of Nebraska by entering

into an unlawful agreement in violation of Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. § 59-821.

188.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 27 & 28: NEVADA**
**(On Behalf of Class Members That Purchased PVC Pipe in Nevada)**

189.     Defendants' conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Nevada; (2) prices of PVC Pipe in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

190.     Defendants violated Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq*., by entering into unlawful agreements in restraint of trade in the State of Nevada. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Nev. Stat. Ann. § 598A.210.

191.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 29 & 30: NEW HAMPSHIRE**
**(On Behalf of Class Members That Purchased PVC Pipe in New Hampshire)**

192.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices of PVC Pipe in the State of New Hampshire were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

193.     Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Antitrust Statute, N.H. Rev. Stat. §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under N.H. Rev. Stat. § 356:11.

194.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. tit. XXXI §§ 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 31 & 32: NEW MEXICO**
**(On Behalf of Class Members That Purchased PVC Pipe in New Mexico)**

195.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughoutNew Mexico; (2) prices of PVC Pipe in the State of New Mexico were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated

prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

196.     Defendants violated the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under N.M. Stat. Ann. § 57-1-3(A).

197.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 33: NEW YORK
### (On Behalf of Class Members That Purchased PVC Pipe in New York)

198.     Defendants have entered into an unlawful agreement in restraint of trade in violation of New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout New York; (2) prices of PVC Pipe in the State of New York were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. More specifically, Defendants' restraint of trade violated New York Gen. Bus. Law § 340(1). Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including

treble damages under New York Gen. Bus. Law §§ 340, *et seq.*

## COUNTS 34 & 35: NORTH CAROLINA
### (On Behalf of Class Members That Purchased PVC Pipe in North Carolina)

199.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes, N.C. Gen. Stat. §§ 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout North Carolina; (2) prices of PVC Pipe in the State of North Carolina were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under N.C. Gen. Stat. § 75-16.

200.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 36: NORTH DAKOTA
### (On Behalf of Class Members That Purchased PVC Pipe in North Dakota)

201.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout North Dakota; (2) prices of PVC Pipe in the State of North Dakota were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated

prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

202.     Defendants' anticompetitive actions have violated North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under N.D. Cent. Code § 51-08.1-08.

## COUNT 37: OREGON
### (On Behalf of Class Members That Purchased PVC Pipe in Oregon)

203.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Oregon; (2) prices of PVC Pipe in the State of Oregon were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

204.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Or. Rev. Stat. § 646.780.

## COUNT 38: PUERTO RICO
### (On Behalf of Class Members That Purchased PVC Pipe in Puerto Rico)

205.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Puerto Rico; (2) prices of PVC Pipe in Puerto Rico were raised, fixed, maintained, stabilized at

artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Puerto Rico commerce.

206.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Puerto Rico Antitrust Statute, P.R. Laws Ann. tit. 10 §§ 258, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under P.R. Laws Ann. tit. 10 §§ 268.

### COUNTS 39 & 40: RHODE ISLAND
### (On Behalf of Class Members That Purchased PVC Pipe in Rhode Island)

207.    Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Rhode Island; (2) prices of PVC Pipe in the State of Rhode Island were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

208.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under R.I. Gen. Laws § 6-36-11.

209.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 41: SOUTH CAROLINA
### (On Behalf of Class Members That Purchased PVC Pipe in South Carolina)

210.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout South Carolina; (2) prices of PVC Pipe in the State of South Carolina were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Carolina.

211.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under S.C. Code Ann. § 39-5-140.

## COUNTS 42 & 43: SOUTH DAKOTA
### (On Behalf of Class Members That Purchased PVC Pipe in South Dakota)

212.     Defendants' combination or conspiracy had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout South Dakota; (2) prices of PVC Pipe in the State of South Dakota were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected commerce in South Dakota.

213.     Defendants' anticompetitive actions have violated South Dakota Antitrust Statute, S. D. Codified Laws §§ 37-1-1, *et seq*. Accordingly, Plaintiffs and members of the

Class seek all forms of relief including treble damages under S.D. Codified Laws § 37-1-24.

214.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws §§ 37-24, *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 44: TENNESSEE
### (On Behalf of Class Members That Purchased PVC Pipe in Tennessee)

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Tennessee; (2) prices of PVC Pipe in the State of Tennessee were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Tenn. Code Ann. § 47-25-106.

## COUNT 45: UTAH
### (On Behalf of Class Members That Purchased PVC Pipe in Utah)

216.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* Specifically, (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Utah; (2) prices of PVC Pipe in the State of Utah were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open

competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available including treble damages under Utah Code Ann. § 76-10-3109.

## COUNT 46: VERMONT
### (On Behalf of Class Members That Purchased PVC Pipe in Vermont)

217.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Vermont; (2) prices of PVC Pipe in the State of Vermont were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under Vt. Stat. Ann. tit. 9, § 2465.

## COUNT 47: WEST VIRGINIA
### (On Behalf of Class Members That Purchased PVC Pipe in West Virginia)

218.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout West Virginia; (2) prices of PVC Pipe in the State of West Virginia were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially

affected West Virginia commerce. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages under W. Va. Code §§ 47-18-9.

## COUNT 48: WISCONSIN
### (On Behalf of Class Members That Purchased PVC Pipe in Wisconsin)

219.    Defendants' combinations or conspiracies had the following effects: (1) price competition for PVC Pipe was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices of PVC Pipe in the State of Wisconsin were raised, fixed, maintained, stabilized at artificially high levels; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for PVC Pipe. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wisconsin Antitrust Act, Wis. Stat. Ann. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief including treble damages, under Wis. Stat. Ann. §§ 133.18.

## XI.    UNJUST ENRICHMENT

### COUNT 49
### Violation of State Common Law Unjust Enrichment Laws
### (on Behalf of Plaintiffs and the Damages Class)

220.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

221.    Plaintiffs bring this claim under the unjust enrichment laws of the following states: Alabama, Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota,

Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

222.     The elements required to prove an unjust enrichment claim are generally the same under the laws of each of the relevant states. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

223.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on the sales of PVC Pipe.

224.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and members of the Statewide Damages Class for PVC Pipe.

225.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue generated by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of PVC Pipe.

226.     Plaintiffs and members of the Statewide Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and members of the Statewide Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Classes may make claims on a pro rata basis.

227.     Pursuit of any remedies against the firms from which Plaintiffs and Class members purchased PVC Pipe subject to Defendants' conspiracy would have been futile, as

those firms are not liable and cannot reasonably be expected to compensate Plaintiffs and

the Class members for Defendants' unlawful conduct.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a.   Determine that this action may be maintained as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

b.   Adjudge and decree that the acts of Defendants are illegal and unlawful, and are a *per se* violation (or alternatively illegal under a quick look rule or a full rule of reason analysis) of various state antitrust and consumer protection laws as alleged above;

c.   Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.   Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

e.   Award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.    JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of

all issues so triable.

Dated: April 21, 2025                                      Respectfully submitted,

                                                          */s/ Terry Rose Saunders*
                                                          Terry Rose Saunders (IL Bar No. 2462877)
                                                          **THE SAUNDERS LAW FIRM**
                                                          120 North LaSalle Street, Suite 2000

Chicago, IL 60602
Telephone: (312) 444-9656
tsaunders@saunders-lawfirm.com

Christopher T. Micheletti
Qianwei Fu
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

***Counsel for Plaintiffs and the Proposed
End-User Classes***